# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 22-1528V

| | |
|---|---|
| EBONY HENDERSON,<br><br>　　　　　　　　　Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　　　Respondent. | Special Master Horner<br><br>Filed: July 16, 2025<br><br>Reissued for Public Availability:<br>August 12, 2025 |

*Ebony Henderson*, Erie, PA, pro se petitioner.
*Mitchell Jones*, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION[1]

On October 13, 2022, petitioner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa, *et seq.* (2012) ("Vaccine Act"),[2] alleging that she suffered a right shoulder injury as a result of an influenza ("flu") vaccination she received on October 13, 2019. (ECF No. 1.) For the reasons set forth below, I conclude that petitioner is *not* entitled to compensation.

### I.   Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines. In general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious, long-standing injury; and has received no previous award or settlement on account of the injury. Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury. In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury." That is, it may be

---

[1] Pursuant to Vaccine Rule 18(b), this Decision was initially filed on July 16, 2025, and the parties were afforded 14 days to propose redactions. The parties did not propose any redactions. Accordingly, this Decision is reissued in its original form for posting on the court's website.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

1

shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table.  If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination.  § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(i); § 300aa-14(a); § 300aa-13(a)(1)(B).

As relevant here, the Vaccine Injury Table lists Shoulder Injury Related to Vaccine Administration ("SIRVA") as a compensable injury if it occurs within ≤48 hours of administration of a flu vaccine.  § 300aa-14(a), *amended by* 42 C.F.R. § 100.3.  Table Injury cases are guided by "Qualifications and aids in interpretation" ("QAI"), which provide more detailed explanation of what should be considered when determining whether a petitioner has actually suffered an injury listed on the Vaccine Injury Table. § 300aa-14(a).  To be considered a Table SIRVA petitioner must show that his/her injury fits within the following definition:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm.  These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction.  SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.).  SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, and any other neuropathy).

42 C.F.R. § 100.3(c)(10).

2

Alternatively, if no injury falling within the Table can be shown, a petitioner could still demonstrate entitlement to an award by instead showing that the vaccine recipient's injury or death was caused-in-fact by the vaccination in question.  § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii).  In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321-22 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006).  To successfully demonstrate causation-in-fact, petitioner bears a burden to show: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury.  *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof.  § 300aa-13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2 (alternation in original); *see also Snowbank Enters., Inc. v. United States*, 6 Cl. Ct. 476, 486 (1984) (explaining that mere conjecture or speculation is insufficient under a preponderance standard).  Proof of medical certainty is not required.  *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991).  However, a petitioner may not receive a Vaccine Program award based solely on her assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician.  § 300aa-13(a)(1).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1).  Special masters must ensure each party has had a "full and fair opportunity" to develop the record.  Vaccine Rule 3(b)(2).  However, special masters are empowered to determine the format for taking evidence based on the circumstances of each case.  Vaccine Rule 8(a); Vaccine Rule 8(d).  Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties.  Vaccine Rule 8(b)(1). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." § 300aa-13(b)(1)(A).  The special master is required to consider all the relevant evidence of record, draw plausible

3

inferences, and articulate a rational basis for the decision. *Winkler v. Sec'y of Health & Human Servs.*, 88 F.4th 958, 963 (Fed. Cir. 2023) (citing *Hines ex rel. Sevier v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991)).

## II.   Procedural History

Petitioner initially filed this action pro se; however, counsel entered an appearance on petitioner's behalf in December of 2022. Thereafter, petitioner filed medical records marked as Exhibits 1-9 between February and August of 2023. Respondent then filed his report recommending against compensation in December of 2023. (ECF No. 34.) Based on review of the medical records, the government contended that (1) petitioner's condition was not limited to the shoulder in which she received her vaccination, as required by the Table criteria for SIRVA, and (2) that an IV insertion, occurring at about the same time, would alternatively explain her symptoms. (*Id.* at 11-12.) Respondent further observed that the medical records contained no diagnosis of a cognizable injury and no medical opinion that would support vaccine-causation of petitioner's symptoms. (*Id.* at 13-14.)

Petitioner was ordered to file an expert report supporting her claim in February of 2024. Although updated orthopedic medical records were filed (Ex. 10), no expert medical opinion was presented. As of August 2024, petitioner's counsel advised the court of her intention to withdraw as counsel of record. (ECF No. 41.) In response, a Rule 5 Order was issued, which I directed counsel to discuss with petitioner. (ECF No. 44.) In that order, I explained why petitioner was unlikely to prevail without presentation of an expert opinion and, further, why I felt it was unlikely petitioner would be able to secure a credible expert opinion based on the history contained in her medical records. (*Id.* at 3-4.)

I initially permitted petitioner a 60-day continuance to locate alternative counsel, which she was apparently unable to do, but then in January of 2025, reset petitioner's filing deadline for an expert report, giving petitioner until March 24, 2025, to file an expert report and advising that she must meet this filing deadline regardless of whether her current counsel departed the case. (ECF No. 48.) I advised that if no expert report were filed, then I would issue an order to show cause why this case should not be dismissed. (*Id.*) Petitioner's counsel confirmed petitioner was provided a copy of that order. (ECF No. 49.) Petitioner's March 24, 2025 filing deadline passed without the filing of any expert report. Instead, on March 25, 2025, petitioner's former counsel moved to withdraw (ECF No. 54), and I granted that motion. (ECF No. 60.)

Accordingly, an order to show cause was issued on April 1, 2025, giving petitioner three months, until June 30, 2025, to file an expert medical opinion as well as a brief pursuant to Vaccine Rule 8(d) explaining why petitioner believed she is entitled to compensation. (ECF No. 62.) Petitioner was advised that "I intend to decide this case based on the record as it then exists. If petitioner does not meaningfully develop the record of this case, my decision will result in dismissal." (*Id.* at 5.)

In response to the order to show cause, petitioner filed 27 photographs of her medical records, with yellow highlighting of certain notations. (ECF No. 66.) All of the photographed records are from either October of 2019 or August of 2022 and all are records that have been previously filed. Petitioner did not file any expert medical opinion or a brief supporting her belief that she is entitled to compensation.

In light of the above, I have determined that the parties have had a full and fair opportunity to present their cases and that it is appropriate to resolve entitlement on the existing record. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *see also Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record").

### III. Factual History

#### a. Pre-Vaccination History

Petitioner's pre-vaccination medical history is significant for right finger fracture, right arm tendonitis, hypertension, anemia, asthma, chest pain, nonischemic cardiomyopathy, cardiomegaly, and congestive heart failure. (Ex. 6, pp. 3-57; Ex. 9, pp. 518-22, 540-43, 769-74.) Petitioner also reported a prior history of three "mini-strokes" in 2014, resulting in right-sided weakness, two hospitalizations, and six months of rehabilitation. (Ex. 7, p. 33.) In 2017, she was still presenting with a limp. (*Id.*)

On August 14, 2019, petitioner presented to the emergency department at the University of Pennsylvania Medical Center with complaints of neck pain and right shoulder pain. (Ex. 9, pp. 847-52.) She described "constant sharp/aching sensation in the lateral side of the right shoulder and in the right side of her neck with no radiation." (*Id.* at 848.) The pain was aggravated by movement. (*Id.*) At the onset of her shoulder pain, petitioner also experienced dizziness, headache, and tingling in the right arm; however, these symptoms had since resolved. (*Id.*) Petitioner again reported her history of "mini strokes" and indicated that her current symptoms were consistent with the symptoms that she "typically gets with her mini strokes." (*Id.*) On physical exam, petitioner's pain was "reproducible with abduction and external rotation of the right glenohumeral joint." (*Id.* at 849-50.) Her exam, testing, and imaging were otherwise unremarkable. (*Id.* at 849-51.) Petitioner was discharged home with a diagnosis of musculoskeletal right shoulder pain, a prescription for short a course of anti-inflammatory medication, and a home exercise plan for her shoulder. (*Id.* at 851.)

On September 25, 2019, petitioner returned to the emergency department with intermittent dizziness, vision changes, and neck pain that was primarily present on the sides of her neck and aggravated with movement. (Ex. 3, p. 374.) Following an unremarkable physical exam and further testing, petitioner's treaters suspected that her pain was "likely musculoskeletal and neck." (*Id.* at 375-76.) She was discharged home with a prescription for a topical gel to treat her neck pain. (*Id.* at 376-77.)

### b. Post-Vaccination History

Petitioner presented to the emergency department on October 12, 2019, with complaints of headache, blurred vision, slurred speech, numbness/tingling in her right upper extremity, and difficulty walking due to imbalance. (Ex. 3, p. 99.) Petitioner was admitted for further evaluation of stroke-like symptoms. (*Id.* at 101.) Her musculoskeletal exam showed normal range of motion and strength with no tenderness, but her neurologic exam showed decreased sensation in the right upper and lower extremities. (*Id.* at 99.) An MRI of the cervical spine revealed mild degenerative changes and foraminal stenosis, and an MRI of the brain showed "[s]ome small scattered white matter hyperintensities mostly right hemisphere, nonspecific." (Ex. 9, pp. 1008-09.) Beginning on October 12, 2019, petitioner had a peripheral intravenous ("IV") line placed in her right forearm. (Ex. 3, pp. 339-40.) On October 13, 2019, petitioner received the subject flu vaccine in her right deltoid. (*Id.* at 7.) About an hour later, petitioner had an occupational therapy assessment that noted bilateral range of motion and strength within normal limits. (*Id.* at 342-46.) The peripheral IV line was removed on October 14, 2019. (*Id.* at 339-40.) The listed reason for removal is "painful" and "[n]o longer needed." (*Id.*) Petitioner was discharged on October 15, 2016, with diagnoses of right-sided numbness and nonischemic cardiomyopathy. (*Id.* at 86-90.)

However, petitioner returned to the emergency department at the University of Pennsylvania Medical Center on October 15, 2019, with complaints of "right arm pain for several days." (Ex. 9, pp. 1085-86.) The history of present illness notes that petitioner "was admitted on Saturday and had an IV placed at that time. Patients states that when the IV was placed she had a sharp shooting pain up her arm. This did not go away and she is still complaining of similar pain today." (*Id.* at 1086.) Petitioner described her intermittent pain as sharp, shooting, and radiating to her "head and entire body," but she denied any numbness, tingling, or decreased grip strength. (*Id.*) She denied feeling pain on presentation, and she was noted to have no tenderness in the area of the IV site and no swelling or erythema. (*Id.* at 1086, 1088.) Petitioner was advised that her symptoms were likely the result of "injury to the nerve from IV insertion." (*Id.* at 1088.) She was offered pain medication but advised that her injury would likely take some time to heal. (*Id.*) Petitioner was ultimately discharged home with a diagnosis of right arm pain. (*Id.*)

Later that same day, petitioner presented to the emergency department at Saint Vincent Hospital, complaining of right arm pain. (Ex. 8, p. 10.) She attributed her arm pain to an IV placement and stated that she "thinks they struck a nerve." (*Id.*) She described worsening pain affecting her "whole arm with any sort of movement," as well as intermittent chest pain. (*Id.* at 10, 14.) A physical exam revealed right arm pain with movement. (*Id.* at 11-12.) Petitioner underwent a CT angiogram of her chest that showed no evidence of pulmonary embolism and a chest x-ray that revealed no acute pulmonary abnormalities. (*Id.* at 29, 61-62.) However, a vascular ultrasound revealed right upper extremity brachiocephalic deep venous thrombosis ("DVT") that was associated with catheter placement. (*Id.* at 29, 35, 64.) Petitioner was given IV Heparin

and admitted for further evaluation and treatment for DVT. (*Id.* at 29, 35.) Because she presented with chest pain, petitioner was also monitored on telemetry, despite her EKG results showing no ischemic changes. (*Id.* at 29, 35.) The admitting physician believed that her chest pain was likely related to her upper extremity DVT and to motion of her right arm. (*Id.* at 35.) A subsequent physical exam showed right upper extremity edema and tenderness to palpation around the biceps, especially over the brachiocephalic and lateral biceps. (*Id.* at 32.) Petitioner was discharged home on October 17, 2019, with a three-month course of anticoagulation (Xarelto) "for what appears to be a provoked DVT in the setting of catheterization of the right upper extremity after recent hospitalization." (*Id.* at 37-42.) She was directed to follow up with her primary care provider. (*Id.* at 39.)

On October 19, 2019, petitioner again presented to the emergency department at Saint Vincent Hospital, this time complaining of shortness of breath with right-sided upper chest and arm pain. (Ex. 8, p. 219.) She reported that she noticed right-sided pain in her anterior and lateral chest walls shortly after waking up that morning. (*Id.*) Her pain was aching in character, aggravated by breathing, and associated with shortness of breath and lightheadedness. (*Id.*) Petitioner's chest x-ray appeared stables, and her EKG again showed no ischemic changes. (*Id.* at 223.) She was discharged home and directed to follow up with her primary care provider and a cardiologist. (*Id.*) However, petitioner returned to the emergency department about a month later, on December 18, 2019, with complaints of lightheadedness, nausea, blurry vision, and cough. (*Id.* at 301-02.) She denied shortness of breath and chest pain, tightness, or discomfort. (*Id.* at 302.) She was subsequently discharged home in a stable condition with no clear cause for her symptoms. (*Id.* at 306-07.) There is no mention of arm pain during this encounter. On January 3, 2020, petitioner underwent a venous doppler ultrasound of the right upper extremity, which showed "[n]o evidence of any deep or superficial vein thrombosis in the right upper extremity." (Ex. 6, p. 165.)

On January 13, 2020, petitioner presented to nurse practitioner Christopher Cain at her primary care office. (Ex. 6, pp. 64-72.) Petitioner reported intermittent pain and swelling in her right arm, and that she was still taking Xarelto. (*Id.* at 64.) On exam, petitioner's arm appeared normal. (*Id.* at 69-70.) Petitioner's arm remained normal in appearance on subsequent exams during follow up primary care encounters on January 29, January 31, and February 3, 2020. (*Id.* at 73-97.) She was continued on Xarelto, and provided at-home exercises and stretches. (*Id.* at 78, 86-87, 94.)

Petitioner underwent a chest x-ray on February 4, 2020, which showed "[m]ild cardiomegaly similar to the prior study" and "[n]o acute pulmonary process." (Ex. 6, p. 168.) She had a pacemaker implanted in February of 2020, and a subsequent chest x-ray showed no evidence of acute cardiopulmonary disease. (*Id.* at 488-89; Ex. 8, p. 166.) There was no mention of arm pain during her primary care encounters on February 18 and March 3, 2020. (Ex. 6, pp. 98-114.)

On June 26, 2020, petitioner presented to nurse practitioner Cain, complaining of right arm pain. (Ex. 6, p. 115.) Her pain was reportedly aggravated by bending, lifting,

and movement.  (*Id.*)  Although she denied weakness, she described not being able to use her right arm for more than 20 minutes.  (*Id.*)  Nurse practitioner Cain noted petitioner's relevant medical history, including her right-sided DVT secondary to catheter placement in October and follow up ultrasound that was negative for DVT in January.  (*Id.*)  He specifically noted, "Pain, functional difficulties since around this time."  (*Id.*)  On exam, petitioner's right arm, wrist, and hand appeared normal.  (*Id.* at 120-21.)  Nurse practitioner Cain assessed petitioner with chronic DVT of the brachial vein of the right upper extremity and right upper extremity tendinopathy secondary to the DVT.  (*Id.* at 121.)  He specifically noted that the tendinopathy "was felt to be provoked by problem that occurred with IV access back in October 2019," and that petitioner's right extremity strength, range of motion, sensation, and circulation were normal on exam.  (*Id.*)  Petitioner denied any numbness or tingling and was referred to a hand surgeon for further evaluation.  (*Id.*)

On August 7, 2020, petitioner presented to the emergency department at Saint Vincent Hospital with complaints of right arm pain and swelling.  (Ex. 8, pp. 976-77.)  She also reported slight tingling and numbness, and she described an episode of chest pain and shortness of breath that "felt different" when compared to her typical symptoms and "was right-sided and radiate[d] down her right arm."  (*Id.*)  Petitioner stated that her symptoms began "a couple weeks ago after using hand shears cutting her bushes," but that "today it changed and felt similar to when she had her previous DVT."  (*Id.*)  After further questions, petitioner admitted that "she was using hand shears [a] couple days ago and that her pain started the day after."  (*Id.* at 981.)  Petitioner's physical exam, EKG, and chest x-ray was unremarkable.  (Id. at 976, 981.)  A vascular ultrasound showed a filling defect in the brachial vein, but no clot was visualized.  (*Id.* at 981.)  It was suspected that these findings related to her prior DVT and did not evidence a new DVT.  (*Id.*)  Petitioner was ultimately discharged home and advised to follow up with her primary care provider.  (*Id.*)

Petitioner had a primary care encounter on August 13, 2020.  (Ex. 6, p. 133.)  Sean Leonard, D.O., recorded a history of present illness that included right arm nerve pain and DVT following IV placement during an October 2019 hospitalization.  (*Id.*)  Petitioner reported that her right arm pain had "been exacerbated over the last 2 weeks after using hedge shears."  (*Id.*)  She also reported that she previously presented to the emergency department for her symptoms, and after a normal work up, she was told that her pain was likely due to nerve damage in her right arm.  (*Id.*)  Dr. Leonard diagnosed neuropathy of the right upper extremity, ordered an EMG of the right arm, and prescribed gabapentin.  (*Id.* at 140.)  His assessment also included chronic DVT of the brachial vein of the right upper arm, and petitioner was continued on Xarelto.  (*Id.*)

On September 14, 2020, petitioner presented to hand surgeon Mary Beth Cermak, M.D., for evaluation of right arm nerve damages that "all started after an IV insertion [on] October 12, 2019."  (Ex. 1, pp. 27-28.)  She complained of forearm pain, and described shocking pain down her arm, along with numbness and tingling in the median nerve distribution.  (*Id.* at 28.)  On exam, petitioner had some mild swelling of her forearm and a positive Tinel's test at the wrist with no thenar atrophy.  (*Id.*)  X-rays

8

of her right wrist and forearm were normal with no fractures, malalignment, or osseous abnormality. (*Id.*) Dr. Cermak's impression was "[p]ossible right carpal tunnel syndrome versus median nerve injury." (*Id.*) She ordered an MRI of petitioner's right arm and wrist. (*Id.*)

Petitioner's next primary care encounter was on January 27, 2021. (Ex. 6, p. 152.) Nurse practitioner Cain recorded a pertinent history of present illness that included sharp pain in the right arm and shoulder, which was associated with swelling, tingling, and weakness, and aggravated by movement and pushing. (*Id.*) She also recorded a one-month history of aching, burning, and swelling in the right foot. (*Id.*) Her impression included "[p]rovoked clot 10/2019, complication from IV line." (*Id.* at 158.) She specifically noted that petitioner's "[a]rm today is tender with very minimal swelling but this has been consistent since clot, even at time of negative ultrasound." (*Id.*) Another ultrasound was ordered, and petitioner was referred to a hematologist. (*Id.*) Regarding petitioner's right upper extremity neuropathy, nurse practitioner Cain noted a positive response to gabapentin and directed petitioner to continue following with Dr. Cermak. (*Id.* at 159.) Petitioner's right foot pain was noted as possibly "consistent with plantar fasciitis based on symptoms and heel tenderness on exam," and she was referred to a podiatrist. (*Id.* at 160.)

On February 19, 2021, petitioner presented to certified registered nurse practitioner April Sweeney to establish new care. (Ex. 9, p. 63.) In pertinent part, petitioner reported that "she began to experience nerve damage to her Right upper extremity and she feels it is from either a previous influenza injection she had [been] given in [her] deltoid or possibly an IV that she had in her right arm." (*Id.*) This is the first time that petitioner implicated her flu vaccination as a potential cause of her right arm symptoms. Petitioner had a normal range of motion on physical exam, but she refused a further flu vaccination. (*Id.* at 63, 66.) Nurse practitioner Sweeney's assessment included acute thrombosis of the right upper extremity. (*Id.* at 67-68.) Petitioner was advised to continue taking Xarelto as prescribed. (*Id.* at 68.) A venous ultrasound on February 22, 2021, again showed no evidence of any deep or superficial vein thrombosis in the right upper extremity. (Ex, 6, p. 164.)

On May 15, 2021, petitioner presented to the emergency department at Saint Vincent Hospital. (Ex. 9, p. 129.) She described a three-day history of "increasing pain in the biceps area up into her right shoulder and up into the anterior chest on the right side." (*Id.*) It was noted that petitioner's "[p]ain is achy and somewhat intermittent. Moderate to severe. Deep breathing seems to make it a little bit worse[;] some positions make it a little bit worse as well. Nothing seems to make it much better but Tylenol does help a little bit." (*Id.*) Her chest pain was also associated with shortness of breath. (*Id.*) It was further noted that petitioner "had some intermittent pains in that arm since she had the DVT in 2019. She states over the past 3 days this is significantly changed and she feels like there is more swelling and the pain has moved into the chest." (*Id.* at 133.) No arm swelling was observed on physical exam. (*Id.*) Petitioner was not suspected to have ischemic heart disease or DVT. (*Id.*) She was subsequently discharged home and advised to follow up with her primary care provider. (*Id.*)

Petitioner had a primary care encounter with nurse practitioner April Cass on November 19, 2021.  (Ex. 9, p. 194.)  During this encounter, petitioner reported right arm pain that "initially presented in 2019 after receiving a flu shot to her right bicep rather than her deltoid." (*Id.*)  She described weakness when lifting anything heavier than a gallon of milk and pain that radiated down to her wrist, but she denied any numbness or tingling.  (*Id.*)  Nurse practitioner Cass noted that an EMG in March of 2021 showed no evidence of peripheral neuropathy, plexopathy, radiculopathy, or myopathy, and that a venous ultrasound in May of 2021 was negative for DVT.  (*Id.*)  On physical exam, petitioner had normal range of motion and some tenderness without swelling in her right upper arm.  (*Id.* at 198.)  Nurse practitioner Cass suggested Tylenol and heat to treat petitioner's right arm pain, and she referred petitioner to physical therapy.  (*Id.* at 201.)

Petitioner presented for an initial physical therapy evaluation on December 2, 2021.  (Ex. 2, pp. 54-55.)  Petitioner reported right arm pain, swelling, numbness, and tingling "following a blood clot that occurred after she received a vaccine on October 13, 2019." (*Id.* at 54.)  She also reported "nerve damage in her arm secondary to the blood clot." (*Id.*)  She described weakness, including difficulty lifting and carrying objects for more than 15 minutes and opening bottles, and throbbing pain when laying on her right side.  (*Id.*)  The pain was localized to her right biceps while the numbness and tingling radiated down her entire arm and into her fingers.  (*Id.*)  She rated her pain a 3 out of 10 at best and an 8 out of 10 at worst.  (*Id.*)  During this encounter, petitioner rated her pain a 3 out of 10.  (*Id.*)  On exam, petitioner was noted to demonstrate weakness in her bilateral upper extremities, pain in her right biceps and lower arm, numbness and tingling from her elbow to her hand, and difficulty completing activities of daily living and functional activities.  (*Id.* at 55.)  Petitioner was directed to attend two physical therapy sessions per week for eight weeks.  (*Id.* at 56.)

From December of 2021 until March of 2022, petitioner attended 22 physical therapy sessions.  (Ex. 2.)  Throughout her physical therapy, petitioner reported pain, discomfort, and tightness at various times affecting her chest and her right biceps, shoulder, elbow, and forearm.  (*Id.* at 4-56.)  She also reported numbness and tingling down her entire arm and fingers.  (*Id.*)  Petitioner was subsequently discharged from physical therapy due to insurance issues.  (*Id.* at 3.)  She returned for 4 additional physical therapy sessions between May 19 and July 5, 2022.  (*Id.* at 58-73.)  Upon returning to physical therapy, petitioner reported continued shoulder pain as a result of her vaccination.  (*Id.* at 70.)  She stated that her pain was aggravated by sleeping on her affected shoulder and "using it to turn, push, pull, or lift anything." (*Id.*)  As of May 19, 2022, petitioner reported that her pain was localized to her right biceps or biceps tendon and no longer affected her arm or forearm.  (*Id.* at 67.)  She noted improved pain and range of motion in her right shoulder as of July 5, 2022.  (*Id.* at 61.)  However, she was again discharged on November 1, 2022, due to insurance issues.  (*Id.* at 57, 63.)

On May 2, 2022, petitioner had a primary care encounter, during which she reported a three-day history of left-sided neck pain of an unknown origin.  (Ex. 9, pp.

10

352-54.) She also reported a two-day history of abdominal cramping with an unclear etiology. (*Id.*) Her primary care provider suggested that her symptoms may be stress related. (*Id.* at 353-54.) There is no mention of right shoulder symptoms during this encounter.

On August 15, 2022, petitioner returned to Dr. Cermak with "a chief complaint of arm pain, involving the right anterior distal upper arm." (Ex. 1, p. 3.) She reported that her pain began "after IV insertion 10/19/19 and after flu shot was given." (*Id.*) She further reported that

> The pain has been present for 3 years. The right anterior distal upper arm pain occurs intermittently. The right anterior distal upper arm pain is described as worse with lifting heavy objects, worse with overhead activity, cramp-like, radiating, and throbbing and associated with arm pain, hand numbness, hand tingling, limited range of motion, and swelling.

(*Id.*) A physical exam of the right upper extremity showed thenar atrophy, tenderness over the biceps tendon, and diminished sensation in the fingers. (*Id.*) Dr. Cermak's impression included median nerve injury to the right upper arm, biceps tendinitis on the right acromioclavicular joint, and osteoarthritis. (*Id.*) Dr. Cermak suggested over-the-counter anti-inflammatory medication for petitioner's median nerve injury and ordered an MRI to assess petitioner's right biceps tendinitis. (*Id.* at 3-4.) Petitioner underwent an MRI of her right shoulder on October 4, 2022, which revealed a partial thickness tear of the supraspinatus tendon. (Ex. 3, p. 6.)

The following day, on October 5, 2022, petitioner presented to family practitioner Mary Lasher, D.O., to establish care. (Ex. 9, p. 401.) Petitioner reported that she had been told that her "veins are all damaged from DVT in right arm, swelling. Clot was either caused by flu shot (given anterior arm) or IV." (*Id.*) On physical exam, petitioner's right hand and forearm were cooler than her left side. (*Id.* at 404.) Petitioner was referred to a vascular surgeon. (*Id.* at 400.)

On October 13, 2022, petitioner returned to Dr. Cermak for a review of her October 4, 2022 MRI results. (Ex. 1, p. 5.) Dr. Cermak assessed petitioner with a partial right-sided rotator cuff tear, and petitioner was referred to an orthopedist for further evaluation. (*Id.*)

Thereafter, on October 24, 2022, petitioner presented to orthopedist David German, M.D., right shoulder pain that "began after a flu injection in 2019." (Ex. 5, p. 377.) Petitioner also reported developing DVT in the right arm "around that time." (*Id.*) She indicated that did not appreciate any improvement in her symptoms after her prior physical therapy sessions. (*Id.*) On physical exam, petitioner showed full strength and range of motion without any significant swelling, but she did have pain with overhead motion and impingement. (*Id.*) Petitioner underwent right shoulder x-rays during this encounter that revealed "mild acromial clavicular arthritis," but "otherwise unremarkable appearance." (*Id.* at 378.) Dr. German interpreted petitioner's October 4, 2022 MRI as

11

showing "partial-thickness tear supraspinatus tendon, some AC joint osteoarthritis," but "no evidence of full-thickness tear."  (*Id.*)  He stated that "[t]here is no strong indication for any surgical intervention," and recommended a subacromial steroid injection, which petitioner declined.  (*Id.*)

Petitioner next primary care encounter was on April 6, 2023, with Dr. Lasher, during which petitioner reported continued arm pain.  (Ex. 9, pp. 432-33.)  She explained that she is "very hesitant to get another injection" because "she's fairly certain the DVT which occurred in her arm happened after she got a flu sho[t]."  (*Id.* at 433.)  She did, however, report that physical therapy was "helping" and that she was interested in returning to the orthopedist to discuss other options.  (*Id.*)  Petitioner was referred to an orthopedic surgeon for evaluation of her arm pain.  (*Id.* at 432.)

On June 6, 2023, petitioner presented to sports medicine specialist Jeffrey Kim, D.O., for evaluation of her ongoing arm pain.  (Ex. 5, pp. 422-23.)  Petitioner reported that she developed arm/shoulder pain "shortly" after receiving a flu shot "years ago" and that her pain has persisted.  (*Id.* at 423.)  She also reported right shoulder weakness.  (*Id.*)  She described the pain as initially diffuse about the arm but now localized to below the greater tuberosity.  (*Id.*)  On physical exam, petitioner had right shoulder tenderness and crepitus, but no swelling, reduced range of motion, or reduced strength.  (*Id.* at 424.)  Petitioner also had positive Hawkins, Empty can, and O'Brien tests.  (*Id.* at 425.)  Dr. Kim's impression was "[c]hronic right shoulder pain in the setting of rotator cuff tendinitis with partial tear."  (*Id.* at 422.)  He noted that this has been a longstanding issue for which petitioner has received conservative treatment.  (*Id.*)  Although he believed it to be beneficial, he also noted petitioner's refusal to receive a steroid injection.  (*Id.*)  Instead, petitioner was started on a prednisone taper.  (*Id.* at 422, 426.)  Petitioner was also referred to an orthopedic surgeon for a second opinion.  (*Id.* at 427.)

## IV.    Analysis

As discussed above (*see* Section I, *supra*), SIRVA is by definition a musculoskeletal injury and not a neurologic injury and, in order to demonstrate a Table SIRVA, petitioner must demonstrate four specific criteria by preponderant evidence.  Among those criteria, the fourth SIRVA criterion requires that "[n]o other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, and any other neuropathy)."  42 C.F.R. § 100.3(c)(10)(iv).  Consideration of the fourth SIRVA criterion "requires consideration of a petitioner's medical condition as a whole."  *Record v. Sec'y of Health & Human Servs.*, 175 Fed. Cl. 673, 680 (2025).  However, while the "other condition or abnormality" at issue must qualify as an explanation for the petitioner's symptoms, it "need not be a better or more likely explanation."  *French v. Sec'y of Health & Human Servs.*, No. 20-0862V, 2023 WL 7128178, at *6 (Fed. Cl. Spec. Mstr. Sept. 27, 2023).  Indeed, a petitioner may fail to meet the fourth SIRVA criterion even where there is clinical evidence of an alternative condition that falls short of a definitive diagnosis.  *Durham v. Sec'y of Health & Human Servs.*, No. 17-1899V, 2023 WL 3196229, at *14 (Fed. Cl. Spec. Mstr. May 2, 2023) (noting that the regulation cites

"clinical evidence of" various conditions).  Ultimately, where the presence of another condition is apparent, petitioner bears the burden of proving that the condition nonetheless "would not explain" her symptoms.  *Id.*

In this case, after petitioner began experiencing the symptoms she attributes to SIRVA, she repeatedly discussed shooting nerve pain in her arm that she attributed to an IV placement during a recent hospitalization.  (Ex. 9, p. 1086; Ex. 8, pp. 10, 14.)  Her treating physician felt she had a deep venous thrombosis ("DVT") affecting her brachial nerve that was associated with her IV catheter placement.  (Ex. 8, p. 29.)  Even when nurse practitioner Cain later diagnosed right upper extremity tendinopathy, she still attributed it to the IV access.  (Ex. 6, p. 121.)  Beginning in 2021, petitioner did report to nurse practitioner Cass and nurse practitioner Sweeney that she felt her symptoms were due to her flu vaccination.  (Ex. 9, pp. 63, 194.)  However, there is no indication that either nurse practitioner agreed.  (*Id.* at 63-68, 194-201.)  Thus, the available medical opinion and available medical record evidence favors the conclusion that petitioner's symptoms would be explained by another condition or abnormality, namely a DVT unrelated to her vaccination.

To the extent petitioner herself attributed her symptoms to either nerve damage or a DVT that she nonetheless attributed to her vaccination, this is not the mechanism of injury known as SIRVA.  As noted above, SIRVA is a musculoskeletal injury and not a neurologic injury.  Moreover, in her earliest treatment record, petitioner specifically associated the onset of her right arm pain to her painful IV placement, which she indicated had caused "a sharp shooting pain up her arm."  (Ex. 9, p. 1086.)  Because the IV placement occurred the day before her vaccination, this necessarily places onset of her condition prior to her vaccination.  (Ex. 3, pp. 7, 339-40.)  Petitioner was eventually diagnosed with rotator cuff tendinitis; however, this was years removed from petitioner's flu vaccination, petitioner did have a pre-vaccination history of right shoulder symptoms, and there is no indication her physicians felt her rotator cuff tendinitis was related to her alleged SIRVA.  As respondent delineated in his Rule 4 Report, petitioner was seen for neck and right shoulder pain with tingling in her right arm just two months prior to her vaccination that was diagnosed as musculoskeletal pain.  (Ex. 9, pp. 847-51.)  Additionally, she had a prior history of right arm tendinitis.  (*Id.* at 543.)

I have considered the specific medical records that petitioner highlighted in response to my order to show cause; however, these highlighted records tend to underscore, rather than refute, this understanding of petitioner's medical records. (ECF No. 66.)  For example, petitioner highlighted a history of present illness from her August 15, 2022 medical encounter.  Describing petitioner's chief complaint of right arm pain, it explained that "[t]his occurred in the context of Started after IV insertion 10/12/19 and after flu shot was given and has been treated with Tylenol, which partially alleviates symptoms and Topical."  (ECF No. 66, p. 1.)  This history, which occurred three years after the initial injury, is ambiguous at best in implicating petitioner's flu vaccine as a cause of her injury and is the only notation petitioner highlighted that even mentions the flu vaccine.  By contrast, she highlights multiple records attributing her arm pain to a

13

DVT she experienced after the catheter placement, including a history provided on October 16, 2019, just days after the initial onset. (*Id.* at 8.)

Alternatively, even without meeting the specific requirements of a Table SIRVA, petitioner could still demonstrate that her injury was caused-in-fact by her vaccination, if she could demonstrate "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005). However, the Vaccine Act forbids a special master from ruling in petitioner's favor based solely on his or her assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1). Here, however, none of petitioner's treating physicians attributed her symptoms to her vaccination, whether as a musculoskeletal injury or as DVT-related nerve damage. Petitioner was provided an opportunity to present an expert medical opinion, but no such opinion was presented. Accordingly, there is no medical or expert opinion available to support causation-in-fact.

Given all this, petitioner's history is not compatible with a Table SIRVA and there is not preponderant evidence she suffered any injury caused-in-fact by her vaccination. Instead, the evidence preponderates in favor of a finding that nerve pain resulting from a DVT related to her IV placement was the more likely cause of the symptoms petitioner alleges to have been a SIRVA. And, although petitioner did eventually also carry a diagnosis of tendinitis, this condition predated her vaccination and there is no medical opinion in the record that would support that this condition was caused-in-fact by her vaccination.

## V.    Conclusion

Petitioner has my sympathy for the pain she has endured, and I do not doubt her sincerity in bringing this claim. However, for all the reasons discussed above, she has not met her burden of proof. Therefore, this case is dismissed.[3]

**IT IS SO ORDERED.**

s/Daniel T. Horner<br>
Daniel T. Horner<br>
Special Master

---

[3] In the absence of a timely-filed motion for review of this Decision, the Clerk of the Court shall enter judgment accordingly.