# In the United States Court of Federal Claims

**No. 22-1528V**
**Filed: January 11, 2026**
**Reissued for Publication: February 28, 2026[1]**

| | |
|---|---|
| * * * * * * * * * * * * * * *  * | |
| | * |
| **EBONY HENDERSON,** | * |
| | * |
| **Petitioner,** | * |
| | * |
| v. | * |
| | * |
| **SECRETARY OF HEALTH AND** | * |
| **HUMAN SERVICES,** | * |
| | * |
| **Respondent.** | * |
| | * |
| * * * * * * * * * * * * * *  * | * |
| | * |

**Ebony Henderson**, Erie, PA.

**Mitchell Jones**, Trial Attorney, Torts Branch, Civil Division, United States Department of Justice. Washington, DC, for respondent. With him were **Traci R. Patton**, Assistant Director, Torts Branch, Civil Division, **Heather L. Pearlman**, Deputy Director, Torts Branch, Civil Division, **C. Salvatore D'Alessio**, Director, Torts Branch, Civil Division, and **Brett A. Shumate**, Assistant Attorney General, United States Department of Justice, Washington, DC.

**O P I N I O N**

**HORN, J.**

This case is before the court on petitioner's Motion for Review the decision of the Special Master. On October 13, 2022, petitioner Ebony Henderson filed a petition for compensation with the National Vaccine Injury Compensation Program (Vaccine Program), under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-1–300aa-34 (2018) (Vaccine Act), for a Table injury. <u>See</u> 42 U.S.C. § 300aa-11(c)(1)(C)(i). Petitioner claimed that "she sustained a Shoulder Injury Related to Vaccine Administration (SIRVA) as a result of her receipt of the Influenza vaccination" on October 13, 2019.

---

[1] This Opinion was issued under seal on January 11, 2026. The parties did not propose any redactions to the January 11, 2026 Opinion, and the court, therefore, issues the Opinion without redactions for public distribution.

On July 16, 2025, Special Master Daniel T. Horner issued a decision finding that the petitioner was not entitled to an award of compensation because "she [petitioner] has not met her burden of proof. Henderson v. Sec'y of Health & Hum. Servs., No. 22-1528V, 2025 WL 2322052, at *11 (Fed. Cl. Spec. Mstr. July 16, 2025) (alteration added). Subsequently, on August 18, 2025, petitioner filed a Motion for Review in the United States Court of Federal Claims seeking review of the Special Master's decision denying her claim.[2]

# FINDINGS OF FACT

On October 13, 2022, petitioner filed her petition with the Office of the Special Masters.[3] The October 13, 2022 petition stated in full:

The above-named Petitioner requests compensation under the National Vaccine Injury Compensation Act, 42 U.S.C. § 300aa-1 et seq., for a vaccine injury to herself as specified on the Vaccine Table, 42 U.S.C. § 300aa-14. Petitioner received the Influenza vaccination on October 13, 2019.

2. Ebony Henderson asserts that she sustained a Shoulder Injury Related to Vaccine Administration (SIRVA) as a result of her receipt of the Influenza vaccination.

3. The Influenza vaccine injury is listed on the vaccine table as a vaccine covered by the National Vaccine Injury Compensation Act. See 42 U.S.C. § 300aa-14. Ms. Henderson has suffered residual effects of the vaccine injury for more than six months.

4. Prior to the vaccination, Petitioner had a PIV [Peripheral Intravenous line] placed in her right forearm; however, she had no pain in her right arm at any time before receiving the Influenza vaccination.

5. Petitioner experienced pain in her right shoulder and arm the same day she received her Influenza vaccine, after it had been administered.

6. After complaining of right arm pain to medical staff, her PIV was moved to her left forearm, but she continued to have right shoulder and arm pain. This persisted to the point of Ms. Henderson needing to return to a different hospital the same day.

---

[2] Motions for Review are filed in this court pursuant to 42 U.S.C. § 300aa-12 (2024) and Rule 23 of the Vaccine Rules of the United States Court of Federal Claims (2025) (Vaccine Rules).

[3] Ms. Henderson's case was originally assigned to Chief Special Master Brian H. Corcoran. Ms. Henderson's case was reassigned to Special Master Katherine E. Oler on October 18, 2022, and then reassigned to Special Master Horner on February 13, 2024.

7. Petitioner was diagnosed with a blood clot in her right upper arm on October 16, 2019. She was administered blood thinners and held at the hospital for 3 days.

8. Petitioner attended physical therapy as treatment for her right shoulder and arm injury until Medicaid would no longer pay for it.

8. To this day, Petitioner continues to experience pain, swelling, tingling, and weakness in her right shoulder and arm.

9. On or about October 4, 2022, Petitioner underwent an MRI [Magnetic Resonance Imaging] of her right shoulder. The indication for the MRI was shoulder pain for 3 years.

10. Petitioner has not previously filed a petition under the Vaccine Act and has not previously collected an award or settlement of a civil action for damages secondary to receipt of the Influenza vaccine. Petitioner has a state Medicaid lien.[4] Petitioner has un-reimbursable out of pocket medical expenses as a result of her vaccine-related injury.

11. Petitioner respectfully defers providing a specific dollar amount for her compensation request pursuant to 42 U.S.C. § 300aa-11(e). Petitioner's compensation demand includes an award to cover reasonable attorneys' fees and costs.[5]

/s/Ebony Henderson

Ebony Henderson, Pro Se

(alterations and footnotes added).

In his decision, Special Master Horner examined petitioner's medical history prior to her flu vaccination on October 13, 2019 in a careful recounting of the history and relevant facts to petitioner's claim. Special Master Horner found that based on the medical records submitted:

Petitioner's pre-vaccination medical history is significant for right finger fracture, right arm tendonitis, hypertension, anemia, asthma, chest pain,

---

[4] Ms. Henderson's state Medicaid lien is not referenced in her filings in this court, nor discussed in Special Master Horner's decision.

[5] Petitioner filed her petition with the Office of Special Masters on October 13, 2022 pro se, however, as discussed below, she was represented by counsel during part of the proceedings before Special Master Horner. On December 22, 2022, petitioner filed a motion for Jessica Wallace to be counsel of record for petitioner, which was granted on December 23, 2022. In a March 31, 2025 Order, Special Master Horner granted petitioner's counsel's motion to withdraw as the attorney for Ms. Henderson. Petitioner has appeared pro se throughout the proceedings in this court.

3

nonischemic cardiomyopathy, cardiomegaly, and congestive heart failure. Petitioner also reported a prior history of three "mini-strokes" in 2014, resulting in right-sided weakness, two hospitalizations, and six months of rehabilitation. In 2017, she was still presenting with a limp. On August 14, 2019, petitioner presented to the emergency department at the University of Pennsylvania Medical Center with complaints of neck pain and right shoulder pain. She described "constant sharp/aching sensation in the lateral side of the right shoulder and in the right side of her neck with no radiation." The pain was aggravated by movement. At the onset of her shoulder pain, petitioner also experienced dizziness, headache, and tingling in the right arm; however, these symptoms had since resolved. Petitioner again reported her history of "mini strokes" and indicated that her current symptoms were consistent with the symptoms that she "typically gets with her mini strokes." On physical exam, petitioner's pain was "reproducible with abduction and external rotation of the right glenohumeral joint." Her exam, testing, and imaging were otherwise unremarkable. Petitioner was discharged home with a diagnosis of musculoskeletal right shoulder pain, a prescription for short a course of anti-inflammatory medication, and a home exercise plan for her shoulder. On September 25, 2019, petitioner returned to the emergency department with intermittent dizziness, vision changes, and neck pain that was primarily present on the sides of her neck and aggravated with movement. Following an unremarkable physical exam and further testing, petitioner's treaters suspected that her pain was "likely musculoskeletal and neck." She was discharged home with a prescription for a topical gel to treat her neck pain.

Petitioner presented to the emergency department on October 12, 2019, with complaints of headache, blurred vision, slurred speech, numbness/tingling in her right upper extremity, and difficulty walking due to imbalance. Petitioner was admitted for further evaluation of stroke-like symptoms. Her musculoskeletal exam showed normal range of motion and strength with no tenderness, but her neurologic exam showed decreased sensation in the right upper and lower extremities. An MRI of the cervical spine revealed mild degenerative changes and foraminal stenosis, and an MRI of the brain showed "[s]ome small scattered white matter hyperintensities mostly right hemisphere, nonspecific." Beginning on October 12, 2019, petitioner had a peripheral intravenous ("IV") line placed in her right forearm.

On October 13, 2019, petitioner received the subject flu vaccine in her right deltoid. About an hour later, petitioner had an occupational therapy assessment that noted bilateral range of motion and strength within normal limits. The peripheral IV line was removed on October 14, 2019. The listed reason for removal is "painful" and "[n]o longer needed." Petitioner was discharged on October 15, 2016, with diagnoses of right-sided numbness and nonischemic cardiomyopathy. However, petitioner returned to the emergency department at the University of Pennsylvania Medical Center on

October 15, 2019, with complaints of "right arm pain for several days." The history of present illness notes that petitioner "was admitted on Saturday and had an IV placed at that time. Patients [sic] states that when the IV was placed she had a sharp shooting pain up her arm.[6] This did not go away and she is still complaining of similar pain today." Petitioner described her intermittent pain as sharp, shooting, and radiating to her "head and entire body," but she denied any numbness, tingling, or decreased grip strength. She denied feeling pain on presentation, and she was noted to have no tenderness in the area of the IV site and no swelling or erythema. Petitioner was advised that her symptoms were likely the result of "injury to the nerve from IV insertion." She was offered pain medication but advised that her injury would likely take some time to heal. Petitioner was ultimately discharged home with a diagnosis of right arm pain. Later that same day, petitioner presented to the emergency department at Saint Vincent Hospital, complaining of right arm pain. She attributed her arm pain to an IV placement and stated that she "thinks they struck a nerve." She described worsening pain affecting her "whole arm with any sort of movement," as well as intermittent chest pain. A physical exam revealed right arm pain with movement. Petitioner underwent a CT [Computed Tomography] angiogram of her chest that showed no evidence of pulmonary embolism and a chest x-ray that revealed no acute pulmonary abnormalities. However, a vascular ultrasound revealed right upper extremity brachiocephalic deep venous thrombosis ("DVT") that was associated with catheter placement. Petitioner was given IV Heparin and admitted for further evaluation and treatment for DVT. Because she presented with chest pain, petitioner was also monitored on telemetry, despite her EKG [Electrocardiogram] results showing no ischemic changes. The admitting physician believed that her chest pain was likely related to her upper extremity DVT and to motion of her right arm. A subsequent physical exam showed right upper extremity edema and tenderness to palpation around the biceps, especially over the brachiocephalic and lateral biceps. Petitioner was discharged home on October 17, 2019, with a three-month course of anticoagulation (Xarelto) "for what appears to be a provoked DVT in the setting of catheterization of the right upper extremity after recent hospitalization." She was directed to follow up with her primary care provider.

On October 19, 2019, petitioner again presented to the emergency department at Saint Vincent Hospital, this time complaining of shortness of breath with right-sided upper chest and arm pain. She reported that she noticed right-sided pain in her anterior and lateral chest walls shortly after waking up that morning. Her pain was aching in character, aggravated by breathing, and associated with shortness of breath and lightheadedness. Petitioner's chest x-ray appeared stables, and her EKG again showed no

---

[6] In his analysis, Special Master Horner identifies the October 15, 2019 visit as petitioner's "earliest treatment record" after vaccination. See Henderson v. Sec'y of Health & Hum. Servs., 2025 WL 2322052, at *10.

ischemic changes. She was discharged home and directed to follow up with her primary care provider and a cardiologist. However, petitioner returned to the emergency department about a month later, on December 18, 2019, with complaints of lightheadedness, nausea, blurry vision, and cough. She denied shortness of breath and chest pain, tightness, or discomfort. She was subsequently discharged home in a stable condition with no clear cause for her symptoms. There is no mention of arm pain during this encounter. On January 3, 2020, petitioner underwent a venous doppler ultrasound of the right upper extremity, which showed "[n]o evidence of any deep or superficial vein thrombosis in the right upper extremity."

On January 13, 2020, petitioner presented to nurse practitioner Christopher Cain at her primary care office. Petitioner reported intermittent pain and swelling in her right arm, and that she was still taking Xarelto. On exam, petitioner's arm appeared normal. Petitioner's arm remained normal in appearance on subsequent exams during follow up primary care encounters on January 29, January 31, and February 3, 2020. She was continued on Xarelto, and provided at-home exercises and stretches. Petitioner underwent a chest x-ray on February 4, 2020, which showed "[m]ild cardiomegaly similar to the prior study" and "[n]o acute pulmonary process." She had a pacemaker implanted in February of 2020, and a subsequent chest x-ray showed no evidence of acute cardiopulmonary disease. There was no mention of arm pain during her primary care encounters on February 18 and March 3, 2020.

Henderson v. Sec'y of Health & Hum. Servs., 2025 WL 2322052, at *4-6 (footnote and third, fourth, and fifth alterations added; internal references omitted). Additionally, Special Master Horner noted:

On June 26, 2020, petitioner presented to nurse practitioner Cain, complaining of right arm pain. Her pain was reportedly aggravated by bending, lifting, and movement. Although she denied weakness, she described not being able to use her right arm for more than 20 minutes. Nurse practitioner Cain noted petitioner's relevant medical history, including her right-sided DVT secondary to catheter placement in October and follow up ultrasound that was negative for DVT in January. He specifically noted, "Pain, functional difficulties since around this time." On exam, petitioner's right arm, wrist, and hand appeared normal. Nurse practitioner Cain assessed petitioner with chronic DVT of the brachial vein of the right upper extremity and right upper extremity tendinopathy secondary to the DVT. He specifically noted that the tendinopathy "was felt to be provoked by problem that occurred with IV access back in October 2019," and that petitioner's right extremity strength, range of motion, sensation, and circulation were normal on exam. Petitioner denied any numbness or tingling and was referred to a hand surgeon for further evaluation.

On August 7, 2020, petitioner presented to the emergency department at Saint Vincent Hospital with complaints of right arm pain and swelling. She

also reported slight tingling and numbness, and she described an episode of chest pain and shortness of breath that "felt different" when compared to her typical symptoms and "was right-sided and radiate[d] down her right arm." Petitioner stated that her symptoms began "a couple weeks ago after using hand shears cutting her bushes," but that "today it changed and felt similar to when she had her previous DVT." After further questions, petitioner admitted that "she was using hand shears [a] couple days ago and that her pain started the day after." Petitioner's physical exam, EKG, and chest x-ray was unremarkable. A vascular ultrasound showed a filling defect in the brachial vein, but no clot was visualized. It was suspected that these findings related to her prior DVT and did not evidence a new DVT. Petitioner was ultimately discharged home and advised to follow up with her primary care provider.

Henderson v. Sec'y of Health & Hum. Servs., 2025 WL 2322052, at *6 (alterations in original; internal references omitted). Special Master Horner's decision also observed petitioner had undergone primary care visits on August 13, 2020, September 14, 2020, January 27, 2021, February 19, 2021, November 21, 2021, May 2, 2022, August 15, 2022, October 5, 2022, October 13, 2022, and April 6, 2023. See id. at *6-10. Petitioner also visited an orthopedist on October 24, 2022, and a sports medicine specialist on June 6, 2023. Additionally, petitioner attended physical therapy sessions between December 2021 and July 2022. See id. at *8.

Regarding the procedural history of the petitioner's case, Special Master Horner explained:

Petitioner initially filed this action pro se; however, counsel entered an appearance on petitioner's behalf in December of 2022. Thereafter, petitioner filed medical records marked as Exhibits 1-9 between February and August of 2023. Respondent then filed his report recommending against compensation in December of 2023. Based on review of the medical records, the government contended that (1) petitioner's condition was not limited to the shoulder in which she received her vaccination, as required by the Table criteria for SIRVA, and (2) that an IV insertion, occurring at about the same time, would alternatively explain her symptoms. Respondent further observed that the medical records contained no diagnosis of a cognizable injury and no medical opinion that would support vaccine-causation of petitioner's symptoms. Petitioner was ordered to file an expert report supporting her claim in February of 2024. Although updated orthopedic medical records were filed, no expert medical opinion was presented. As of August 2024, petitioner's counsel advised the court of her intention to withdraw as counsel of record. In response, a Rule 5 Order was issued, which I directed counsel to discuss with petitioner. In that order, I explained why petitioner was unlikely to prevail without presentation of an expert opinion and, further, why I felt it was unlikely petitioner would be able to secure a credible expert opinion based on the history contained in her medical records.

I initially permitted petitioner a 60-day continuance to locate alternative counsel, which she was apparently unable to do, but then in January of 2025, reset petitioner's filing deadline for an expert report, giving petitioner until March 24, 2025, to file an expert report and advising that she must meet this filing deadline regardless of whether her current counsel departed the case. I advised that if no expert report were filed, then I would issue an order to show cause why this case should not be dismissed. Petitioner's counsel confirmed petitioner was provided a copy of that order. Petitioner's March 24, 2025 filing deadline passed without the filing of any expert report.

Henderson v. Sec'y of Health & Hum. Servs., 2025 WL 2322052, at *3 (internal references omitted). Special Master Horner continued:

[O]n March 25, 2025, petitioner's former counsel moved to withdraw, and I granted that motion. Accordingly, an order to show cause was issued on April 1, 2025, giving petitioner three months, until June 30, 2025, to file an expert medical opinion as well as a brief pursuant to Vaccine Rule 8(d) explaining why petitioner believed she is entitled to compensation. Petitioner was advised that "I intend to decide this case based on the record as it then exists. If petitioner does not meaningfully develop the record of this case, my decision will result in dismissal."

In response to the order to show cause, petitioner filed 27 photographs of her medical records, with yellow highlighting of certain notations. All of the photographed records are from either October of 2019 or August of 2022 and all are records that have been previously filed. Petitioner did not file any expert medical opinion or a brief supporting her belief that she is entitled to compensation. In light of the above, I have determined that the parties have had a full and fair opportunity to present their cases and that it is appropriate to resolve entitlement on the existing record.

Id. (alteration added; internal references omitted).

Despite petitioner only filing documents that had already been filed and not providing an expert medical opinion or a brief supporting petitioner's belief that she is entitled to compensation, Special Master Horner provided a detailed analysis of petitioner's claims and her medical history. Regarding petitioner Shoulder Injury Related to Vaccine Administration claim, Special Master Horner explained:

As relevant here, the Vaccine Injury Table lists Shoulder Injury Related to Vaccine Administration ("SIRVA") as a compensable injury if it occurs within ≤48 hours of administration of a flu vaccine.[7] [42 U.S.C.] § 300aa-14(a),

---

[7] The Code of Federal Regulations at 42 C.F.R. § 100.3 (2025) provides the time frame "for first symptom or manifestation of onset or of significant aggravation after vaccine administration" for Shoulder Injury Related to Vaccine Administration is less than or equal to 48 hours. As explained by the Chief Special Master in an unrelated vaccine decision:

amended by 42 C.F.R. § 100.3. Table Injury cases are guided by "Qualifications and aids in interpretation" ("QAI"), which provide more detailed explanation of what should be considered when determining whether a petitioner has actually suffered an injury listed on the Vaccine Injury Table. [42 U.S.C.] § 300aa-14(a). To be considered a Table SIRVA petitioner must show that his/her injury fits within the following definition:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

---

While more often than not Table claimants allege immediate pain, a Table SIRVA can succeed even if the pain does not manifest until up to 48 hours post-vaccination. The claim's most likely temporal "target" for occurrence has thus been widened somewhat, in fairness to possible claimants. See, e.g., National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table, 80 FR 45132-01 ("[i]n order to capture the broader array of potential injuries, the Secretary proposes to add SIRVA for all tetanus toxoid-containing vaccines that are administered intramuscularly through percutaneous injection into the upper arm. The interval of onset will be less than or equal to 48 hours").

Bulman v. Sec'y of Health & Hum. Servs., No. 19-1217V, 2023 WL 5844348, at *12 (Fed. Cl. Spec. Mstr. Aug. 16, 2023) (alteration in original).

9

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, and any other neuropathy).

42 C.F.R. § 100.3(c)(10).

Henderson v. Sec'y of Health & Hum. Servs., 2025 WL 2322052, at *1-2 (omission in original; footnote and alterations added). Special Master Horner determined:

In this case, after petitioner began experiencing the symptoms she attributes to SIRVA, she repeatedly discussed shooting nerve pain in her arm that she attributed to an IV placement during a recent hospitalization. Her treating physician felt she had a deep venous thrombosis ("DVT") affecting her brachial nerve that was associated with her IV catheter placement. Even when nurse practitioner Cain later diagnosed right upper extremity tendinopathy, she still attributed it to the IV access. Beginning in 2021, petitioner did report to nurse practitioner [April] Cass and nurse practitioner [April] Sweeney that she felt her symptoms were due to her flu vaccination. However, there is no indication that either nurse practitioner agreed. Thus, the available medical opinion and available medical record evidence favors the conclusion that petitioner's symptoms would be explained by another condition or abnormality, namely a DVT unrelated to her vaccination.

To the extent petitioner herself attributed her symptoms to either nerve damage or a DVT that she nonetheless attributed to her vaccination, this is not the mechanism of injury known as SIRVA. As noted above, SIRVA is a musculoskeletal injury and not a neurologic injury. Moreover, in her earliest treatment record, petitioner specifically associated the onset of her right arm pain to her painful IV placement, which she indicated had caused "a sharp shooting pain up her arm." Because the IV placement occurred the day before her vaccination, this necessarily places onset of her condition prior to her vaccination. Petitioner was eventually diagnosed with rotator cuff tendinitis; however, this was years removed from petitioner's flu vaccination, petitioner did have a pre-vaccination history of right shoulder symptoms, and there is no indication her physicians felt her rotator cuff tendinitis was related to her alleged SIRVA. As respondent delineated in his Rule 4 Report, petitioner was seen for neck and right shoulder pain with tingling in her right arm just two months prior to her vaccination that was diagnosed as musculoskeletal pain. Additionally, she had a prior history of right arm tendinitis.

I have considered the specific medical records that petitioner highlighted in response to my order to show cause; however, these highlighted records tend to underscore, rather than refute, this understanding of petitioner's medical records. For example, petitioner highlighted a history of present

illness from her August 15, 2022 medical encounter[8]. Describing petitioner's chief complaint of right arm pain, it explained that "[t]his occurred in the context of Started after IV insertion 10/12/19 and after flu shot was given and has been treated with Tylenol, which partially alleviates symptoms and Topical." This history, which occurred three years after the initial injury, is ambiguous at best in implicating petitioner's flu vaccine as a cause of her injury and is the only notation petitioner highlighted that even mentions the flu vaccine. By contrast, she highlights multiple records attributing her arm pain to a DVT she experienced after the catheter placement, including a history provided on October 16, 2019, just days after the initial onset.

Henderson v. Sec'y of Health & Hum. Servs., 2025 WL 2322052, at *10-11 (internal references omitted; footnote and alterations added).

After concluding petitioner did not meet her burden to prove a Table injury related to a Shoulder Injury Related to Vaccine Administration, Special Master Horner explained:

Alternatively, even without meeting the specific requirements of a Table SIRVA, petitioner could still demonstrate that her injury was caused-in-fact by her vaccination, if she could demonstrate "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." Althen v. Sec'y of Health & Human Servs., 418 F.3d 1274, 1278 (Fed. Cir. 2005). However, the Vaccine Act forbids a special master from ruling in petitioner's favor based solely on his or her assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. [42 U.S.C.] § 300aa-13(a)(1). Here, however, none of petitioner's treating physicians attributed her symptoms to her vaccination, whether as a musculoskeletal injury or as DVT-related nerve damage. Petitioner was provided an opportunity to present an expert medical opinion, but no such opinion was presented. Accordingly, there is no medical or expert opinion available to support causation-in-fact. Given all this, petitioner's history is not compatible with a Table SIRVA and there is not preponderant evidence she suffered any injury caused-in-fact by her vaccination. Instead, the evidence preponderates in favor of a finding that nerve pain resulting from a DVT related to her IV placement was the more likely cause of the symptoms petitioner alleges to have been a SIRVA. And, although petitioner did eventually also carry a diagnosis of tendinitis, this condition predated her vaccination and there is no medical opinion in the

---

[8] In the "Post-Vaccination History" portion of his decision, Special Master Horner explained: "On August 15, 2022, petitioner returned to Dr. Cermak with "a chief complaint of arm pain, involving the right anterior distal upper arm." Henderson v. Sec'y of Health & Hum. Servs., 2025 WL 2322052, at *8.

record that would support that this condition was caused-in-fact by her vaccination.

Henderson v. Sec'y of Health & Hum. Servs., 2025 WL 2322052, at *11 (alteration added). Therefore, Special Master Horner concluded: "Petitioner has my sympathy for the pain she has endured, and I do not doubt her sincerity in bringing this claim. However, for all the reasons discussed above, she has not met her burden of proof. Therefore, this case is dismissed." Id.

After Special Master Horner's July 16, 2025 decision, on August 18, 2025, petitioner filed a Motion for Review in this court. Petitioner's Motion for Review stated in full:

To Whom it may concern

Im[9] kindly asking for a review of my claim. Which I didn't get included with my last deadline. Due to the help I received. Which is stated below. The exhibits are the highlighted areas. Which will show musculoskeletal issues on the 15th of October. I Ebony Henderson, feel that I should be compensated for my injury due to the vaccine I received in October 13, 2019. In my medical records will show I had limited range of motion in the 48hr period according to the vaccine table of injury. When emergy care and the fire department show up .. on the 15th of October. It's stated that I had limited range of motion shown in exhibit (1 ). This is also stated in the emergency room records at Allegheny Health Network shown in exhibit (2). The reasons for the delay in treatment is because I was told by Dr. Shahriar Alam MD I couldn't stay.I only stayed in the hospital for 2days shown in exhibit (3).My PCP [primary care physician] at the time didn't want to treat me for my injuries. Only one Doctor was going to treat me was, her name is Sandra Arnold with Community Health Net. Dr. Arnold left the practice. This while I was trying to get treatment or seen for my injuries by. Then over time my entire right arm gotten worse. This can happen if left untreated.

Shown in exhibit (4). According to my research. I was then by my physical therapist told I had a torn rotator cuff tear. I was also told by two orthopedic doctors shown in exhibit (5).Two months prior of injury in October. I was told that it was due to the migraine pain that caused my neck and shoulder pain. Shown in exhibit (6).but I had normal range of motion. Prior to this incident I never had any problems with the vaccine. It's not documented no wear in my medical records. Only when I had TIA.,[ Transient Ischemic Attack[10]] but I had physical therapy and the problem was solved. Which is stated in my

---

[9] Capitalization, grammar, punctuation, abbreviations, spelling, and choice of words when quoted in this Opinion are as they originally appear in petitioner's submissions.

[10] The only references to "TIA" are in Ms. Henderson's Motion for Review and her reply brief. Petitioner has note offered further explanation in either filing.

12

medical records. I have witnesses that will state that my shoulder and arm was normal prior to this incident.

Ebony Henderson

(footnotes and alteration added).

On September 17, 2025, defendant filed a response to the Motion for Review. Initially, defendant argues that "this Court lacks the authority to review petitioner's untimely appeal." Defendant contends that "the failure of petitioner to file her MFR [Motion for Review] in a timely manner constituted a waiver of the right to seek review." (alteration added). Additionally, defendant argues on the merits of the Special Master's decision, "petitioner has not shown that Special Master Horner's Decision was arbitrary, capricious, or otherwise not in accordance with the law. Accordingly, the Decision should be upheld and the MFR should be dismissed." Defendant argues that, if this court reviews the merits of Special Master Horner's decision, "Special Master Horner correctly found that petitioner had not presented preponderant evidence that the flu vaccination she received on October 13, 2019, resulted in her alleged shoulder injury, and he properly dismissed her petition."

Petitioner's reply to the Motion for Review was largely similar to her Motion for Review, including portions that were identical to the Motion for Review, and petitioner did not address the concerns raised in defendant's response to the Motion for Review, including defendant's timeliness jurisdictional arguments or defendant's argument that petitioner did not allege that Special Master Horner had erred in his decision. Petitioner's reply brief stated in full:

To Whom it may concern

This is my narrative of events. Which I didn't get included with my last deadline. Due to the help I received. Which is stated below. The exhibits are the highlighted areas. Which will show musculoskeletal issues on the 15th of October. I Ebony Henderson, feel that I should be compensated for my injury due to the vaccine I received in October 13, 2019. In my medical records will show I had limited range of motion in the 48hr period according to the vaccine table of injury. When emergy care and the fire department show up .. on the 15th of October. It's stated that I had limited range of motion shown in exhibit (1 ). This is also stated in the emergency room records at Allegheny Health Network shown in exhibit (2). The reasons for the delay in treatment is because I was told by Dr.Shahriar Alam MD I couldn't stay.I only stayed in the hospital for 2days shown in exhibit (3).My PCP at the time didn't want to treat me for my injuries. Only one Doctor was going to treat me was, her name is Sandra Arnold with Community Health Net. Dr. Arnold left the practice. This while I was trying to get treatment or seen for my injuries by. Then over time my entire right arm gotten worse. This can happen if left untreated. Shown in exhibit (4). According to my research. I was then by my physical therapist told I had a torn rotator cuff tear. I was also told by two orthopedic doctors shown in exhibit (5).Two months prior of injury in October. I was told that it was due to the migraine

13

pain that caused my neck and shoulder pain. Shown in exhibit (6).but I had normal range of motion.

Prior to this incident I never had any problems with any of the vaccines my entire life. It's not documented no where in my medical records. Only when I had TIA., but I had physical therapy and the problem was solved. Which is stated in my medical records.When I was admitted to UPMC I complained about my injury to each nurse and doctors about it. The very first day which will be October 13-15th of 2019. I was rushed out of the hospital on the day I was released from UPMC by the head nurse Jennifer. My daughter (Roxanne)was present at the time of this incident.My daughter (RaKeysha) was present when the fire department and EMS arrived at my home and and both hospitals. My daughters called the 911 cause I was in severe pain. My neighbor also saw me on the day of October 13 2019 the day I was released from UPMC. I was at her house complaining about my upper arm was hurting. My daughter Reshema was present at the time I received the vaccine. I have witnesses that will state that my shoulder and arm was normal prior to this incident.

Ebony Henderson

In this court, petitioner also attached a statement from her daughter RaKeysha Henderson as well as another statement from petitioner repeating the substantially similar statements as included in petitioner's Motion for Review and her reply to the Motion for Review.

### D I S C U S S I O N

Under the Vaccine Act, a Special Master "to whom a petition has been assigned shall issue a decision on such petition with respect to whether compensation is to be provided under the Program and the amount of such compensation." 42 U.S.C. § 300aa-12(d)(3)(A). Vaccine Rule 10, which is titled "Decision of the Special Master," similarly indicates that a Special Master "will issue a decision on the petition with respect to whether an award of compensation is to be made and, if so, the amount thereof." Vaccine Rule 10(a) (2025).

The Special Master's decision then "may be reviewed by the United States Court of Federal Claims in accordance with subsection (e)." 42 U.S.C. § 300aa-12(d)(3)(A). The statute at 42 U.S.C. § 300aa-12(e) (2024) states:

(1) Upon issuance of the special master's decision, the parties shall have 30 days to file with the clerk of the United States Court of Federal Claims a motion to have the court review the decision. If such a motion is filed, the other party shall file a response with the clerk of the United States Court of Federal Claims no later than 30 days after the filing of such motion.

(2) Upon the filing of a motion under paragraph (1) with respect to a petition, the United States Court of Federal Claims shall have jurisdiction to undertake a review of the record of the proceedings and may thereafter--

14

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

(C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa-12(e)(1)-(2); see also Vaccine Rule 23(a) (2025) ("To obtain review of the special master's decision, a party must file a motion for review with the clerk within 30 days after the date the decision is filed."). Vaccine Rule 23(b) states that no extensions of time in which to file a motion for review may be granted, and that "the failure of a party to file a motion for review in a timely manner will constitute a waiver of the right to obtain review." Vaccine Rule 23(b). The legislative history of the Vaccine Act states: "The conferees have provided for a limited standard for appeal from the [special] master's decision and do not intend that this procedure be used frequently, but rather in those cases in which a truly arbitrary decision has been made." H.R. Rep. No. 101-386, at 517 (1989) (Conf. Rep.), reprinted in 1989 U.S.C.C.A.N. 3018, 3120 (alteration added).

In defendant's response to petitioner's Motion for Review, defendant argues that "this Court lacks the authority to review petitioner's untimely appeal." As described above, on July 16, 2025, Special Master Horner issued his decision dismissing Ms. Henderson's petition and on August 18, 2025, petitioner filed her Motion for Review in the United States Court of Federal Claims. Vaccine Rule 23 requires that a party seeking review of a Special Master's decision file a motion for review within thirty days of when the decision is filed, and states that "[n]o extensions of time will be permitted under this rule and the failure of a party to file a motion for review in a timely manner will constitute a waiver of the right to obtain review." Vaccine Rule 23(a)-(b) (alteration added); see also Mahaffey v. Sec'y of Health & Hum. Servs., 368 F.3d 1378, 1381 (Fed. Cir. 2004) (quoting Taylor v. Sec'y of Health & Hum. Servs., 34 Fed. Cl. 137, 141 (1995)) (alteration added) ("'Section 12(e) [42 U.S.C. § 300aa-12(e)] explicitly states that the thirty-day filing period, in which the petitioner has to file a motion for review, starts to run upon issuance of the special master's decision.'"); Williams v. Sec'y of Health & Hum. Servs., 176 Fed. Cl. 215, 216 (2025) ("Vaccine Rule 23 likewise mandates that a party must move for review of a special master's decision within thirty days of the decision and that no extensions of time can be granted."); Byrd v. Sec'y of Health & Hum. Servs., 175 Fed. Cl. 490, 494 (2025); Betancourt v. Sec'y of Health & Human Servs., 81 Fed. Cl. 447, 448 (2008). The Judge of the United States Court of Federal Claims in Betancourt found that a motion for review filed just one day late was untimely:

Because the 30–day limitation period expired on January 9, 2008, the petition filed on January 10, 2008 was untimely. Plaintiff has not responded

15

to defendant's motion, but given that the time period to file the motion for review is statutorily mandated, the Court would not be in a position to grant an extension or otherwise waive the time limitation, were plaintiff to request such action. See, e.g., Waller v. Secretary of Health & Human Servcs., 76 Fed. Cl. 321 (2005) (holding that the 30–day period within which to file a petition for review of a special master's decision could not be extended or waived, where the petition was filed one day late based on counsel for petitioner's erroneous belief that the time for filing a motion for review ran from the date the special master's decision was entered on the electronic docket, rather than the date the decision was filed).

Betancourt v. Sec'y of Health & Hum. Servs., 81 Fed. Cl. at 448.

The docket in the above-captioned case indicates that after Special Master Horner issued his July 16, 2025 decision dismissing Ms. Henderson's petition, Ms. Henderson did not file any documents during the statutory thirty-day time period with the United States Court of Federal Claims. The first filing in the case after Special Master Horner's July 16, 2025 decision was petitioner's August 18, 2025 Motion for Review. Therefore, there is nothing on the docket in this case in the thirty days following the Special Master's July 16, 2025 decision that could be used to satisfy the requirement of filing a motion for review under Vaccine Rule 23.

Defendant raised the issue of the failure to timely file the Motion for Review in defendant's September 17, 2025 response to the Motion for Review, arguing that, "petitioner did not file her MFR until August 18, 2025, beyond the prescribed period. Pursuant to Vaccine Rule 23(b), no extensions of time are permitted, and the failure of petitioner to file her MFR in a timely manner constituted a waiver of the right to seek review." Defendant continues: "On that basis alone, the special master's Decision should be upheld, and the MFR should be dismissed." Plaintiff, however, did not respond or address defendant's waiver argument in her reply brief. Notably, "'[a] party's failure to raise an argument in an opening or responsive brief constitutes waiver." Superior Waste Mgmt. LLC v. United States, 169 Fed. Cl. 239, 297 (2024) (quoting Sarro & Assocs., Inc. v. United States, 152 Fed. Cl. 44, 58–59 (2021)) (alteration added); see also Big Will Trucking, LLC v. United States, 179 Fed. Cl. 54-55 (2025); McCarthy v. United States, 171 Fed. Cl. 469, 481 (2024). Although a pro se petitioner, such as Ms. Henderson, can be entitled to certain leniencies, the petitioner's pro se status "cannot be construed as allowing the court to cast aside jurisdictional prerequisites." See Baker ex rel. Baker v. Sec'y of Health & Human Servs., 61 Fed. Cl. 669, 671 (citations omitted), appeal dismissed, 112 F. App'x 35 (Fed. Cir. 2004). Such a limitation is consistent with the "age-old rule that a court may not in any case, even in the interest of justice, extend its jurisdiction where none exists." See Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 818 (1988); see also Johns-Manville Corp. v. United States, 855 F.2d 1556, 1565 (Fed. Cir. 1988) ("Principles of equity do not support finding jurisdiction exists. A court may not in any case, even in the interest of justice, extend its jurisdiction where none exists." (citation omitted)), cert. denied, 489 U.S. 1086 (1989). Ms. Henderson did not

16

comply with the requirement to timely file her Motion for Review, and that failure constituted a waiver of her right to obtain review in this court.

Although the court has concluded above that this court lacks jurisdiction to consider petitioner's untimely Motion for Review, for the pro se petitioner's benefit, the court includes an examination of why the Special Master's decision also should not be reversed. Regarding the standard of review of a Special Master's decision, the United States Court of Appeals for the Federal Circuit in Markovich v. Secretary of Health & Human Services wrote, "[u]nder the Vaccine Act, the Court of Federal Claims reviews the Special Master's decision to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.' 42 U.S.C. § 300aa-12(e)(2)(B)." Markovich v. Sec'y of Health & Hum. Servs., 477 F.3d 1353, 1355–56 (Fed. Cir.), cert. denied, 552 U.S. 816 (2007) (alteration added); see also Kirby v. Sec'y of Health & Hum. Servs., 997 F.3d 1378, 1381 (Fed. Cir. 2021); Sharpe v. Sec'y of Health & Hum. Servs., 964 F.3d 1072, 1077 (Fed. Cir. 2020).

As explained by the Federal Circuit:

> With regard to both fact-findings and fact-based conclusions, the key decision maker in the first instance is the special master. The Claims Court owes these findings and conclusions by the special master great deference—no change may be made absent first a determination that the special master was "arbitrary and capricious."

Munn v. Sec'y of Health & Hum. Servs., 970 F.2d 863, 870 (Fed. Cir. 1992); see also 42 U.S.C. § 300aa-12(e)(2)(B). "'[R]eversible error is extremely difficult to demonstrate if the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision.'" Kirby v. Sec'y of Health & Hum. Servs., 997 F.3d at 1381 (quoting Lampe v. Sec'y of Health & Hum. Servs., 219 F.3d 1357, 1360 (Fed. Cir. 2000)) (alteration added). The Federal Circuit also has explained: "With respect to factual findings, however, we will uphold the special master's findings of fact unless they are clearly erroneous." K.G. v. Sec'y of Health & Hum. Servs., 951 F.3d 1374, 1379 (Fed. Cir. 2020); (citing Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1278)); Hibbard v. Sec'y of Health & Hum. Servs., 698 F.3d 1355, 1363 (Fed. Cir. 2012) (citing Cedillo v. Sec'y of Health & Hum. Servs., 617 F.3d 1328, 1338 (Fed. Cir. 2010)).

When proving eligibility for compensation for a petition under the Vaccine Act, a petitioner must establish by a preponderance of the evidence that he received a vaccine set forth in the Vaccine Injury Table and that injury caused by the vaccination occurred within the required amount of time. See Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1278; see also 42 U.S.C. § 300aa-11(c)(1)(A). Regarding the preponderance of the evidence standard, the Vaccine Act requires "'the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.'" Moberly ex rel. Moberly v. Sec'y of Health and Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (alterations in original) (quoting Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602 (1993)). In demonstrating this preponderance of

17

evidence, petitioner may not rely on his or her testimony alone to establish preponderant evidence of vaccine administration. According to the Vaccine Act, "[t]he special master or court may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." 42 U.S.C. § 300aa-13(a)(1). In weighing the evidence, the Special Master has discretion to determine the relative weight of the evidence presented, including contemporaneous medical records and oral testimony. See Burns v. Sec'y of Health & Hum. Servs., 3 F.3d 415, 417 (Fed. Cir. 1993) (finding that the Special Master had thoroughly considered evidence in record, had discretion not to hold an additional evidentiary hearing); see also Hibbard v. Sec'y of Health & Hum. Servs., 698 F.3d at 1368 (finding it was not arbitrary or capricious for the Special Master to weigh diagnoses of different treating physicians against one another, including when their opinions conflict). A Special Master is "not required to discuss every piece of evidence or testimony in [his or] her decision." Snyder ex rel. Snyder v. Sec'y of Health & Hum. Servs., 88 Fed. Cl. 706, 728 (2009) (alteration added); see also Mosley v. Sec'y of Health & Hum. Servs., 119 Fed. Cl. 734, 743 (2015).

Initially, defendant argues that in petitioner's Motion for Review, "petitioner has made no showing that the special master erred – she does not allege that the special master's Decision was arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with the law." It is not clear from petitioner's Motion for Review, or her reply brief, what errors she believes were present in Special Master Horner's decision, and if those errors were errors in factual findings or errors in the application of law to petitioner's case. In her Motion for Review petitioner claims: "I Ebony Henderson, feel that I should be compensated for my injury due to the vaccine I received in October 13, 2019. In my medical records will show I had limited range of motion in the 48hr period according to the vaccine table of injury." The reply brief to the Motion for Review repeats: "I Ebony Henderson, feel that I should be compensated for my injury due to the vaccine I received in October 13, 2019. In my medical records will show I had limited range of motion in the 48hr period according to the vaccine table of injury." Petitioner's reply brief continues:

> I was then by my physical therapist told I had a torn rotator cuff tear. I was also told by two orthopedic doctors shown in exhibit (5).Two months prior of injury in October. I was told that it was due to the migraine pain that caused my neck and shoulder pain. Shown in exhibit (6).but I had normal range of motion.

> Prior to this incident I never had any problems with any of the vaccines my entire life. It's not documented no where in my medical records. Only when I had TIA., but I had physical therapy and the problem was solved. Which is stated in my medical records.

Defendant argues that petitioner's Motion for Review "is simply a request that this Court reweigh the evidence and substitute its own judgment to reach a different conclusion." Although petitioner has not identified or alleged any specific error by Special Master Horner, just that petitioner believes she is entitled to compensation, as indicated above, for the pro se petitioner's benefit to understand the court's decision, the court considers the merits of Special Master Horner's decision. As explained above, "[u]nder the Vaccine

18

Act, the Court of Federal Claims reviews the Special Master's decision to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" Markovich v. Sec'y of Health & Hum. Servs., 477 F.3d at 1355–56 (quoting 42 U.S.C. § 300aa-12(e)(2)(B)) (alteration added). As quoted above, "'reversible error is extremely difficult to demonstrate if the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision.'" Kirby v. Sec'y of Health & Hum. Servs., 997 F.3d at 1381 (quoting Lampe v. Sec'y of Health & Hum. Servs., 219 F.3d at 1360); see also Winkler v. Sec'y of Health & Hum. Servs., 88 F.4th 958, 963 (Fed. Cir. 2023) ("That makes reversible error and abuses of discretion 'extremely difficult to demonstrate' when, as is the case here, the Special Master 'considered the relevant evidence of record, dr[ew] plausible inferences and articulated a rational basis for the decision.'" (Hines v. Sec'y of Health & Hum. Servs., 940 F.2d 1518, 1528 (Fed. Cir. 1991) (alteration in original).

Addressing petitioner's claim "that she sustained a Shoulder Injury Related to Vaccine Administration (SIRVA) as a result of her receipt of the Influenza vaccination," Special Master Horner, quoting 42 C.F.R. § 100.3(c)(10), explained:

> To be considered a Table SIRVA petitioner must show that his/her injury fits within the following definition:
>
>> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>>
>> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>>
>> (ii) Pain occurs within the specified time-frame;
>>
>> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

19

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, and any other neuropathy).

Henderson v. Sec'y of Health & Hum. Servs., 2025 WL 2322052, at *1-2 (omission in original). When considering whether petitioner met the criteria for a Shoulder Injury Related to Vaccine Administration, Special Master Horner stated that "SIRVA is by definition a musculoskeletal injury and not a neurologic injury." Id. at *10. Special Master Horner then determined:

In this case, after petitioner began experiencing the symptoms she attributes to SIRVA, she repeatedly discussed shooting nerve pain in her arm that she attributed to an IV placement during a recent hospitalization. Her treating physician felt she had a deep venous thrombosis ("DVT") affecting her brachial nerve that was associated with her IV catheter placement. Even when nurse practitioner Cain later diagnosed right upper extremity tendinopathy, she still attributed it to the IV access. Beginning in 2021, petitioner did report to nurse practitioner Cass and nurse practitioner Sweeney that she felt her symptoms were due to her flu vaccination. However, there is no indication that either nurse practitioner agreed. Thus, the available medical opinion and available medical record evidence favors the conclusion that petitioner's symptoms would be explained by another condition or abnormality, namely a DVT unrelated to her vaccination.

To the extent petitioner herself attributed her symptoms to either nerve damage or a DVT that she nonetheless attributed to her vaccination, this is not the mechanism of injury known as SIRVA. As noted above, SIRVA is a musculoskeletal injury and not a neurologic injury. Moreover, in her earliest treatment record, petitioner specifically associated the onset of her right arm pain to her painful IV placement, which she indicated had caused "a sharp shooting pain up her arm." Because the IV placement occurred the day before her vaccination, this necessarily places onset of her condition prior to her vaccination. Petitioner was eventually diagnosed with rotator cuff tendinitis; however, this was years removed from petitioner's flu vaccination, petitioner did have a pre-vaccination history of right shoulder symptoms, and there is no indication her physicians felt her rotator cuff tendinitis was related to her alleged SIRVA. As respondent delineated in his Rule 4 Report, petitioner was seen for neck and right shoulder pain with tingling in her right arm just two months prior to her vaccination that was diagnosed as musculoskeletal pain. Additionally, she had a prior history of right arm tendinitis.

Id. (internal references omitted). Special Master Horner continued:

I have considered the specific medical records that petitioner highlighted in response to my order to show cause; however, these highlighted records

tend to underscore, rather than refute, this understanding of petitioner's medical records. For example, petitioner highlighted a history of present illness from her August 15, 2022 medical encounter. Describing petitioner's chief complaint of right arm pain, it explained that "[t]his occurred in the context of Started after IV insertion 10/12/19 and after flu shot was given and has been treated with Tylenol, which partially alleviates symptoms and Topical." This history, which occurred three years after the initial injury, is ambiguous at best in implicating petitioner's flu vaccine as a cause of her injury and is the only notation petitioner highlighted that even mentions the flu vaccine. By contrast, she highlights multiple records attributing her arm pain to a DVT she experienced after the catheter placement, including a history provided on October 16, 2019, just days after the initial onset.

Id. at *11 (internal references omitted). Defendant notes "[w]hile petitioner eventually reported her belief that her symptoms were due to her flu vaccination,[11] she did not make this association until sixteen months after vaccination, and Special Master Horner noted that there is no indication that petitioner's medical providers agreed with this association." (footnote and alteration added). Therefore, defendant argues "the special master correctly held that the available medical record evidence favored the conclusion that petitioner's symptoms were more appropriately explained by a DVT unrelated to vaccination." The record before the Special Master and this court supports Special Master Horner's conclusions. Special Master Horner, when considering petitioner's claims, "considered the relevant evidence of record," with specific citations to petitioner's medical records, drew "plausible inferences," and "articulated a rational basis for the decision.'" See Kirby v. Sec'y of Health & Hum. Servs., 997 F.3d at 1381. Special Master Horner's written decision demonstrated that the Special Master's careful examination of petitioner's medical records and the Special Master's determination that petitioner's records did not support her claims for a Table injury of a Shoulder Injury Related to Vaccine Administration was correct.

---

[11] In the "Post-Vaccination History" portion of Special Master Horner's decision, Special Master Horner explained:

> On February 19, 2021, petitioner presented to certified registered nurse practitioner April Sweeney to establish new care. In pertinent part, petitioner reported that "she began to experience nerve damage to her Right upper extremity and she feels it is from either a previous influenza injection she had [been] given in [her] deltoid or possibly an IV that she had in her right arm." This is the first time that petitioner implicated her flu vaccination as a potential cause of her right arm symptoms. Petitioner had a normal range of motion on physical exam, but she refused a further flu vaccination.

Henderson v. Sec'y of Health & Hum. Servs., 2025 WL 2322052, at *7 (alterations in original; internal references omitted).

21

Despite petitioner's broad claim in her filings "that she sustained a Shoulder Injury Related to Vaccine Administration (SIRVA) as a result of her receipt of the Influenza vaccination," Special Master Horner, explained in his decision:

> Alternatively, even without meeting the specific requirements of a Table SIRVA, petitioner could still demonstrate that her injury was caused-in-fact by her vaccination, if she could demonstrate "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury."

Henderson v. Sec'y of Health & Hum. Servs., 2025 WL 2322052, at *10 (quoting Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1278).

Under the off-Table theory of recovery, a petitioner can be entitled to compensation if he or she can demonstrate, by a preponderance of the evidence, that the recipient of the vaccine sustained, or had significantly aggravated, an illness, disability, injury, or condition not set forth in the Vaccine Injury Table, but which was caused by a vaccine that is listed on the Vaccine Injury Table. See 42 U.S.C. §§ 300aa-11(c)(1)(C)(ii)(I), 300aa-13(a)(1)(A); see also LaLonde v. Sec'y of Health & Hum. Servs., 746 F.3d 1334, 1339 (Fed. Cir. 2014); W.C. v. Sec'y of Health & Hum. Servs., 704 F.3d 1352, 1356 (Fed. Cir. 2013) ("Nonetheless, the petitioner must do more than demonstrate a 'plausible' or 'possible' causal link between the vaccination and the injury; he must prove his case by a preponderance of the evidence." (quoting Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d at 1322)); Hines v. Sec'y of Health & Hum. Servs., 940 F.2d at 1525; A.Y. by J.Y. v. Sec'y of Health & Hum. Servs., 152 Fed. Cl. 588, 595 (2021). While scientific certainty is not required, the Special Master "is entitled to require some indicia of reliability to support the assertion of the expert witness." Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d at 1324; see also Hazlehurst v. Sec'y of Health & Hum. Servs., 88 Fed. Cl. 473, 479 (2009), aff'd, 604 F.3d 1343 (Fed. Cir. 2010) (quoting Andreu ex rel. Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d at 1379). As correctly articulated by Special Master Horner in his July 16, 2025 decision, the United States Court of Appeals for the Federal Circuit in Althen v. Secretary of Health and Human Services specified a three-prong test which a petitioner must meet in order to establish causation in an off-Table injury case:

> Concisely stated, Althen's burden is to show by preponderant evidence that the vaccination brought about her injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury.

Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1278 (first alteration added). To establish causation in fact for a Non-Table claim, a petitioner must satisfy all three of the

22

elements established by the United States Court of Appeals for the Federal Circuit in Althen v. Secretary of Health & Human Services, 418 F.3d 1274. See Winkler v. Sec'y of Health & Hum. Servs., 88 F.4th at 961-62.

In his analysis, Special Master Horner correctly explained that "the Vaccine Act forbids a special master from ruling in petitioner's favor based solely on his or her assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician." Henderson v. Sec'y of Health & Hum. Servs., 2025 WL 2322052, at *11. The Vaccine Act at 42 U.S.C. § 300aa-13 (2024) provides: "The special master or court may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." Id.; see also J.S. v. Sec'y of Health & Hum. Servs., 164 Fed. Cl. 314, 340 (2023), aff'd, 2024 WL 4051281 (Fed. Cir. Sept. 5, 2024); Tenneson v. Sec'y of Health & Hum. Servs., 142 Fed. Cl. 329, 338 (2019).

In his decision, Special Master Horner also explained:

> Here, however, none of petitioner's treating physicians attributed her symptoms to her vaccination, whether as a musculoskeletal injury or as DVT-related nerve damage. Petitioner was provided an opportunity to present an expert medical opinion, but no such opinion was presented. Accordingly, there is no medical or expert opinion available to support causation-in-fact. Given all this, petitioner's history is not compatible with a Table SIRVA and there is not preponderant evidence she suffered any injury caused-in-fact by her vaccination. Instead, the evidence preponderates in favor of a finding that nerve pain resulting from a DVT related to her IV placement was the more likely cause of the symptoms petitioner alleges to have been a SIRVA. And, although petitioner did eventually also carry a diagnosis of tendinitis, this condition predated her vaccination and there is no medical opinion in the record that would support that this condition was caused-in-fact by her vaccination.

Henderson v. Sec'y of Health & Hum. Servs., 2025 WL 2322052, at *11. As described above, in the "Procedural History" portion of Special Master Horner's decision, Special Master Horner explained:

> In response to the order to show cause, petitioner filed 27 photographs of her medical records, with yellow highlighting of certain notations. All of the photographed records are from either October of 2019 or August of 2022 and all are records that have been previously filed. Petitioner did not file any expert medical opinion or a brief supporting her belief that she is entitled to compensation.

Id. at *3 (internal references omitted). Special Master Horner, when examining the medical records, in the absence of an expert report or brief from petitioner, explained that petitioner

23

> repeatedly discussed shooting nerve pain in her arm that she attributed to an IV placement during a recent hospitalization. Her treating physician felt she had a deep venous thrombosis ("DVT") affecting her brachial nerve that was associated with her IV catheter placement. Even when nurse practitioner Cain later diagnosed right upper extremity tendinopathy, she still attributed it to the IV access. Beginning in 2021, petitioner did report to nurse practitioner Cass and nurse practitioner Sweeney that she felt her symptoms were due to her flu vaccination. However, there is no indication that either nurse practitioner agreed. Thus, the available medical opinion and available medical record evidence favors the conclusion that petitioner's symptoms would be explained by another condition or abnormality, namely a DVT unrelated to her vaccination.

Id. at *10 (internal references omitted). Special Master Horner also explained that "in her earliest treatment record [identified as October 15, 2019], petitioner specifically associated the onset of her right arm pain to her painful IV placement, which she indicated had caused 'a sharp shooting pain up her arm.' Because the IV placement occurred the day before her vaccination, this necessarily places onset of her condition prior to her vaccination." Id. (internal reference omitted; alteration added). Regarding petitioner's diagnosis of rotator cuff tendinitis, Special Master Horner specifically pointed out that the diagnosis was "years removed from petitioner's flu vaccination, petitioner did have a pre-vaccination history of right shoulder symptoms." Id. Additionally, Special Master Horner noted that "petitioner was seen for neck and right shoulder pain with tingling in her right arm just two months prior to her vaccination that was diagnosed as musculoskeletal pain. Additionally, she had a prior history of right arm tendinitis." Id.

> Defendant argues that
>
> the special master correctly observed that none of petitioner's treating physicians attributed her symptoms to her vaccination, whether as a musculoskeletal injury or as DVT-related nerve damage. Thus, the records themselves do not support petitioner's allegations. And although petitioner was provided with an opportunity to present an expert medical opinion, no such opinion was presented. Accordingly, the special master appropriately found that petitioner had not established that her shoulder injury was caused-in-fact by her flu vaccination.

(internal reference omitted). The court agrees that Special Master Horner rationally determined that petitioner had not demonstrated, by a preponderance of the evidence, that her injury was caused by her vaccination. See Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1326 (Fed. Cir. 2006); see also Cozart v. Sec'y of Health & Hum. Servs., 126 Fed. Cl. 488, 498 (2016).

24

## CONCLUSION

For the reasons stated above, the court finds petitioner's August 18, 2025 Motion for Review of Special Master Horner's July 16, 2025 decision was untimely and must be dismissed. Regardless, Ms. Henderson would not be entitled to compensation because the Special Master's decision was neither arbitrary nor capricious and was in accordance with the law. Petitioner's Motion for Review is **DENIED**. The Clerk of the Court shall enter **JUDGMENT** consistent with this Opinion dismissing petitioner's case.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

25